JUNE TERM, 1868.

---

HARRISON, appellant, and THE NEW JERSEY RAILROAD AND TRANSPORTATION COMPANY, respondents.

1. When the contention is that a mortgage has been taken by the consent of the owner, who is deceased, from the county office where it had been left to be recorded, and placed by the same consent in the custody of the mortgagor, the evidence, on grounds of public policy, must be of the most satisfactory nature.

---

2. Such a case will not be sustained on the mere oath of the mortgagor, unless his character is entirely unimpeached, and his testimony is otherwise free from suspicion.

3. The simple fact that a mortgage is in the possession of the mortgagor, does not *per se,* raise a presumption that the debt secured by it has been paid.

4. A person who has no other evidence that the mortgagor has the legal control of the mortgage, than the word of the mortgagor, and the fact that the mortgage is produced with the seals torn off, runs the risk if he takes title to the mortgaged premises, of the legality of such cancellation.

By an agreement in writing, dated 5th March, 1850, Thomas P. Johnson, one of the defendants, agreed to sell to Joseph Harrison seven eighths of certain lots of lands in Newark, for $2848, the deed to be delivered on or before the first of May, in the same year; the sum of $37.50 to be paid on the delivery of the deed, and the residue to be secured by a mortgage upon those lots, and also upon certain other land, which, by an agreement of the same date, said Harrison agreed to sell to said Johnson. By the agreement first mentioned, Harrison also agreed that he would endeavor to get the title to the remaining one-eighth of said lots, as soon as he could lawfully do so.

The deed was not delivered within the time so agreed on. But afterwards, by a deed dated 21st November, 1853, said Joseph Harrison, together with James and George Harrison, conveyed to Johnson seven eighths of said lots, and Johnson thereupon executed to Joseph Harrison a bond of the same date, for $4500, and in order to secure it, executed a mortgage to said Joseph upon a part of the property so conveyed. This mortgage is of the same date as the deed, and was, on the 6th December, 1853, acknowledged, and left in the clerk's office to be recorded. On the same day, another agreement in writing was made between said Joseph Harrison and said Johnson, whereby, after referring to the agreement first above mentioned, and after reciting that said Harrison had not yet perfected the title to said one eighth of the property, either in himself or Johnson, and that said deed had

been executed for seven eighths thereof to Johnson, and that he had paid and secured to be paid the consideration money for *the whole* of the property, and that Joseph Harrison desired Johnson to pay the whole of said purchase money to him, for his own use, and that of said James and George, it was agreed by said Joseph that he would save harmless and indemnify Johnson from all loss and damage, cost, and expenses, that he might be put to by reason of said Joseph not procuring a good title to Johnson, for said one eighth, and from any damage, injury, expense, or loss, which Johnson might be put to, by reason of any improvements he might put thereon; and that he (Joseph) would, at his own cost and expense, within two years from that date, procure for said Johnson a good title to the whole of the lots mentioned in said deed. At the foot of this last agreement is another agreement, signed by Johnson, to the effect, that if Harrison did not make a good title within two years, he should refund to Johnson $356, with interest from 1st of February, 1850, as liquidated damages.

Johnson took possession of said lots, and made extensive improvements on them, at an expense of about $10,000. He afterwards mortgaged them to Mrs. Woodruff, for $10,000, and her mortgage was duly recorded. After this he agreed to sell the property to Joseph F. Rusling, for $17,000. Before Rusling obtained his deed for the property, he agreed to sell it to the New Jersey Railroad and Transportation Company, and A. S. Hubbell, esq., assisted in examining the title papers, as counsel for Mr. Rusling and the company. Mr. Hubbell searched the record of mortgages in the county clerk's office, in order to ascertain what encumbrances there were upon the property. He there found the record of the mortgage above mentioned, given by Johnson to Harrison. After this, and early in March, 1857, (Mr. Hubbell says it was from the 5th to the 7th, and his impression is that it was on the 6th;) the parties met at the house of Mr. Johnson, who was at that time an invalid and unable to go out, and could speak but little, and only in a whisper. There were then

present, Mr. Johnson, and Mr. Grover, his counsel; Mr. Rusling, and Mr. Hubbell. The mortgage which Johnson had given to Harrison, and which, in his search, Mr. Hubbell had found upon record, was then spoken of. Johnson then produced it with the seals torn off, and handed it to Rusling, and both Johnson and Grover stated that it had been paid and satisfied. Mr. Hubbell also examined it, and was also told by Johnson and Grover that it was all right, and he might take it to the clerk's office and have it canceled and discharged of record. Mr. Hubbell thereupon advised Mr. Rusling that he might safely take the deed, and pay for the property according to the agreement of purchase. Rusling accordingly accepted the deed from Johnson, and paid him $4400 of the purchase money, and executed to him a mort-, gage for $2500, payable when the title to the one eighth should be perfected. Rusling bought, subject to the mortgage for $10,000, given to Mrs. Woodruff. The deed so given by Johnson to Rusling, contains a covenant of warranty of title, and other covenants. Mr. Rusling and Mr. Hubbell then went, on the same day, to the clerk's office, and produced to him the mortgage, with the seals torn off, and at their request the clerk canceled it of record. At the same time Mr. Rusling left the deed with the clerk to be recorded. Mr. Rusling conveyed the property to the company, for $17,000, by deed dated 6th March, 1857, which was recorded the next day. This deed is a deed of quit claim, without covenant of warranty of title. The company at once took possession of the property, and have held it ever since, and have made valuable improvements upon it. Mr. Rusling, and also Mr. Hubbell, both testify that they had no suspicion at the time but that the mortgage from Johnson to Harrison had been fully paid and satisfied.

On 25th April, 1858, Johnson executed an assignment of the $2500 mortgage, so given to him by Rusling, to the complainant, and caused the assignment to be recorded; but the complainant, in his bill, charges that this was done without his knowledge or consent, and says that he is willing to can-

cel that mortgage of record, upon receiving payment of the $4500 mortgage, given by Johnson to Joseph Harrison.

The bill in this cause was filed 3d September, 1861, by James Harrison, as executor of said Joseph Harrison, who died in February, 1855; and said James having died after this suit was commenced, it was revived in the name of Mary Harrison, as administratrix. The bill seeks to have the mortgage given by Johnson to Harrison, and which was canceled as above stated, foreclosed, and the mortgaged premises, which are now owned by the railroad company, sold to satisfy the debt, deducting, however, the said sum of $356, with interest. It charges that the bond which the mortgage was given to secure, has never been paid, and that the whole amount of principal and interest is due; that the mortgage, which had been left in the clerk's office to be recorded, remained there until 2d April, 1856, when the clerk, without authority or right, delivered it to Johnson, who kept it in his possession until 6th March following, when he gave it up to Mr. Hubbell to be canceled of record; that such cancellation of record was illegal and of no effect as against the complainant, and that Rusling and the company have no right to claim any exemption from the force and effect of the mortgage. The complainant tenders himself ready and willing to execute to the railroad company a good title to the said one eighth of the property, which he says he is now able to do.

The company, by their answer, admit the execution of the mortgage so executed by Johnson to Harrison. They say that they purchased the property in good faith, and for a full consideration, which they have paid; that they believed at the time that the mortgage had been fully paid and satisfied; that they caused the record of mortgages to be examined, and there found this mortgage uncanceled of record, but that at the time of the delivery of the deed by Johnson to Rusling (of whom by previous arrangement they had agreed to buy the property when he got it of Johnson,) he, Johnson, produced the mortgage with the seals torn off, stating at the

same time that it was paid and satisfied, and that he then gave it up to be canceled of record; that Rusling believed Johnson, and accepted the deed from him, and paid the consideration as agreed on, in the full belief that the mortgage was satisfied, and that Mr. Hubbell (whom the company say was acting for them as well as for Mr. Rusling) acted under the same belief; that in making their purchase, the company used all reasonable care and diligence to ascertain the condition of the property as to the title and encumbrances, and that having done so, and paid full value for it, the mortgage ought not now be declared to be a lien upon the property. The opinion in the Court of Chancery is reported in 3 C. E. Green, 421.

*Mr. I. W. Scudder* and *Mr. Gilchrist,* for appellant.

*Mr. J. P. Jackson* and *Mr. Bradley,* for respondents.

The opinion of the court was delivered by

THE CHIEF JUSTICE.

The defence in this case cannot rest on the ground that the mortgage in dispute was marked satisfied upon the county register, and that the defendants took their title in reliance upon that fact. The evidence is clear to the point, that at the time the defendants accepted their conveyance this mortgage stood uncanceled of record, and that, being in the possession of the grantor, Mr. Johnson, it was surrendered by him, as a part of the ceremony of the transfer of title, to the defendants, who subsequently, by their agent, presented it, with the seals torn off, to the clerk of the county, who thereupon made the usual entry of satisfaction in the register. It is obvious, therefore, that the defendants did not, and could not, rely, with regard to encumbrances on the property purchased by them, on the information contained in the records of the county. Their information from that source was that the mortgage was a subsisting encumbrance;

and in coming to the opposite conclusion, they reposed confidence, exclusively, in the acts and representations of the vendor of the property at the time of its transmission to them.

In this aspect of the case, it becomes then a matter of prime importance to settle the question of fact as to the manner in which the mortgage in controversy came to the possession of Mr. Johnson, the vendor of the defendants. It is insisted, on the part of the defence, that he acquired the custody of it by the rashness or the folly of Mr. James Harrison, the executor of the mortgagee, and that by thus having it in his hands he was enabled to commit the fraud of pretending it had been satisfied, and delivering it, in its canceled form, at the time of the reception of the title by the defendants. Let us admit, for the present, that the effect of the custody of this instrument by the mortgagor, was all that was claimed for it: the inquiry arises, did this paper come into the possession of Mr. Johnson with the knowledge or by the consent of the executor of the mortgagee? It appears, incontestably in the case, that this instrument was lodged by the mortgagee with the clerk of the county, and that it was withdrawn from that custody by the mortgagor; the burthen, therefore, of showing that such withdrawal was authorized, is on the defendants.

The only witness who testifies in favor of the authority to take this paper from the office, is Mr. Johnson himself. It is shown that it was deposited with the clerk of the county, on the 6th December, 1853, and was taken away by Mr. Johnson on the 2d April, 1856. The mortgagee at this latter date was dead. Mr. Johnson's account of that affair was this; that Mr. James Harrison, who was the executor of the mortgagee, requested him to call and get the mortgage from the clerk's office. The case shows, that at the time when Mr. Johnson took his title to these mortgaged premises, only seven eighths of said premises were conveyed to him, there being subsequently a written agreement that his vendor would endeavor to procure for him the remaining one eighth part; and Mr. Johnson's statement, as a witness in this cause was, that

when the executor of his vendor made the above mentioned request that he would take the mortgage from the county office, he consented that he, Mr. Johnson, might retain it as a pledge, until the title to this one eighth should be procured.

This statement is not sustained in any respect, either directly or indirectly, by any other evidence in the cause. If Mr. James Harrison ever consented to this alleged arrangement, he did an act which was not only indiscreet, but which was a clear violation of his duty as executor. What adequate inducement is shown, leading him to deposit this mortgage, which secured $4500, with large arrears of interest, in the hands of the man who had made it? The pretext is, that it was to stand as security that he would obtain for the mortgagor a conveyance of the lacking eighth part of the premises. But at the time it is asserted he made this hypothecation, he had not even proved the will and thus qualified himself to dispose of any part of the assets of the estate. It is true that his testator had undertaken to complete the title in question, but there is no pretence that he had not honestly made every effort to do so; and by the express terms of his agreement, on his failure to effect such end, the damages were liquidated at the small sum of $356, with interest. The agreement in question was entered into on the 6th day of December, 1853. The testator was not required to give any security for the fulfillment of his part of this contract. He lived until January, 1855; and in the month of April, 1856, it is now claimed that this mortgage, which had been given to secure two thirds of the consideration money on the sale of the premises, was remitted by the executor of the vendor into the hands of the mortgagor. The will was not admitted to probate until the year 1861.

I have considered this account of the witness with care and deliberation, and the more I have weighed the matter the more difficult has it become to me to believe in the truth of his narration. When did it ever before occur that a mortgage was placed in the hands of the mortgagor as collateral security? The executor was under no legal obli-

gation, except to pay, if required, the forfeit of $356, with interest. Is it credible that he would commit to the witness this instrument securing this considerable amount, and thus run the risk of having it canceled upon the record? We are required also to believe that this unwise surrender was made without a word put on paper showing the rights of the respective parties. I have not forgotten that the witness sets up that Mr. James Harrison, the executor, was under a personal promise to him to have the title in question perfected; but this pretence does not at all relieve the singularity of the alleged arrangement; it merely imputes to the executor a personal motive for his dereliction in official duty. I consider this particular transaction so improbable as to call for very plain proof. But more than this: I wish to be understood as maintaining that in every transaction of a similar character, the evidence adduced must be perfectly clear and entirely authentic. If we look at the end to which this testimony tends, the necessity of this rule becomes manifest. The claim is to establish by the evidence of a single witness, that a party who is dead consented that his mortgage should be withdrawn from the custody of the county clerk and placed in the hands of the mortgagor. I cannot say, as a matter of law, that this cannot be done; but in my opinion, the plainest considerations of public policy require that the evidence, to make such an effort successful, should be of the most conclusive character. The witness who undertakes to prove what it is almost against the interest of the community to allow to be proved under any circumstances, should be above suspicion and reproach. But this is not so in the present case, for it is impossible to overlook the fact that the witness in question occupies in this cause a position which must detract much from his weight before the court. He says that he obtained the mortgage by an arrangement with the executor. He admits that he canceled it in fraud of that arrangement. He does not deny that the entire moneys secured by it are unpaid, and that he destroyed it without any authority. He interposes no excuse for his

conduct.   Such a piece of gross dishonesty seriously impairs the moral standing of the witness, and loudly admonishes the court that his testimony is not entitled to that degree of estimation which of right belongs to the depositions of men of integrity.

Nor does the imperfection of the defence, on this part of the case, end at this point.   The bill alleges that this mortgage was surreptitiously obtained from the public office, and this important fact is not denied in the answer, but in avoidance of it, the defendants put their defence on the distinct ground, deriving their information from the witness in question, that the mortgage had been paid off, and that on this account it had been lawfully withdrawn from the hands of the public custodian.   This important averment in the answer is in the words following, viz.   "But these defendants are informed by the said Thomas P. Johnson, and believe and charge the truth to be, that the said mortgage was satisfied by the said Thomas P. Johnson, to the said Joseph Harrison (the mortgagee) in his lifetime, and that he was lawfully entitled to the possession of the said mortgage, and had full right to cancel the same."   When this answer was filed, it is to be remembered that James Harrison, the executor of the mortgagee, was living, and it, therefore, appears that at that time the witness, Mr. Johnson, did not pretend that he had the authority of such executor to take this paper from the office; on the contrary, his statement to the defendants then was, that he had paid to the mortgagee the money due upon it, and thus had a right to control the instrument; but subsequently, when he was examined as a witness, the executor had died, and in repugnancy to his previous statement, he admitted that the mortgage money remained unpaid, and then set up, what it does not appear he ever before had pretended, that the recently deceased executor had made the arrangements with him heretofore specified.   In order to persuade the court of the truth of the present testimony of this witness, the defendants, therefore, must insist that his account to them was wholly and wilfully false; they must

2 T *

put themselves upon the ground that, although he deceived them, he is not now attempting to deceive the court. Under such circumstances, I do not perceive how a decision in this case can be rested, with the necessary confidence, on the mere word of this witness. It is also in proof, that long after the pretended authorization of the witness, the executor, Mr. Harrison, acted in a manner which clearly showed that he was in entire ignorance of the fact that this mortgage was out of his own hands, and that, although the counsel of the executor had repeated conversations with Mr. Johnson about this encumbrance, the latter set up no such pretext as he afterwards resorted to, but, in the expression of the witness, *evaded* the subject. Taking this view of the testimony, I have concluded that the defendants have, in this particular, failed in their proof, and that it must be taken as a settled fact in the cause, that the mortgage in question passed from the possession of the county clerk to that of Mr. Johnson by wrong, and without the assent or knowledge of the executor of the mortgagee.

Placing the case on this basis, it follows as an incontestable conclusion, that the mortgage must be sustained. On the assumption that the executor, the legal owner of the mortgage, did not consent to its being placed in the power of the mortgagor, there remains no pretense to impute laches or neglect to him, and consequently there is no principle of equity applicable to the juncture, which can lead to the result that he has lost any of his rights. Acquitting the executor of indiscretion in the affair, all we have left is the single fact of a fraud committed by the mortgagor upon the defendants. None of the consequences of that fraud can be visited on the executor, who is an innocent party. The defendants trusted to the acts and representations of the mortgagor, and in that way were deceived, and they must bear the loss, the familiar rule of equity being, that as between parties without fault, when a fraud is committed, the burthen must fall upon him who was instrumental, though innocently so, in the realization of such deceit. Nor is it necessary here to consider how

the defendants would have been affected if this mortgage had been canceled on the record when they made their search for encumbrances, because they are not in a situation to claim in their favor that artificial efficacy which the statute gives to such cancellation. This case does not present the question as to the effect which should be adjudged to follow a statutory extinguishment of the registry of a mortgage, when such extinguishment has been obtained by covin, and against a party who has not forfeited any of his rights by his negligence or misconduct. That proposition is in no wise involved in the present issue, and no opinion is intended to be intimated with regard to it. The rights of the present parties were fixed before this mortgage was erased from the record, and such rights cannot be affected by the act of the defendants subsequent to the transaction, and in which the other party did not, either expressly or by indirection, participate. The rule—admitting such to be the rule—that the cancellation of record is conclusive in favor of subsequent *bona fide* purchases and mortgagees, is one of great harshness and can be vindicated only on considerations of public utility and social policy. In cases in which an instrument of this nature is canceled by fraud and without fault in the owner of it, the property of an innocent party is obviously made a sacrifice for the common good ; and I think, therefore, it is clear that the sphere of the operation of the rule should not be extended to any case not strictly within it. In the case now before the court, the defendants did not part with their money on the faith of the representations of this public record, and the consequence is they do not bring themselves within the principle which they invoked.

Nor is the view which I take on the other branch of the case more favorable to the contention of the defendants. It does not seem to me that if the mortgagee did put the mortgage in the hands of the mortgagor, as testified to by the latter, that such act contributed, in a legal sense, to the production of the fraud in question. A person is legally responsible for those consequences only which legitimately

result from his acts; he cannot be called to account for the indiscreet conduct of others, based upon those acts. This rule has been conspicuously exemplified in that extended series of cases in which the doctrine has been maintained, that a party cannot claim to be a *bona fide* purchaser who takes a title to land without inquiry when the possession is in a third party, who, in point of fact, has title, but who has neglected to record his deed. See 2 *Lead. Cas. in Equity* 1, *Basset* v. *Nosworthy, and notes.* In this class of decisions it is obvious that the possessor of the land is chargeable with an indiscretion in not recording his conveyance; but as such neglect, coupled with the fact of his possession, is not sufficient, in the judgment of the law, to mislead a person of ordinary prudence, he loses none of his rights as against those who jump to rash conclusions from such circumstances. And, similarly, in this case, in my estimation, the mortgagee under the above supposed condition of things, could not be charged with a legal default, inasmuch as the possession of the mortgage, by the mortgagor, is not calculated to deceive a person exercising that degree of care which the law requires in transactions of such a nature. For it is clear, I think, that the exhibition of the mortgage did not show that the debt secured by it was paid; on the contrary, it evinced that there was a bond outstanding which was the legitimate evidence of such indebtedness. The mortgage is the mere adjunct of the bond, which is the obligation manifesting the debt, and which, wherever it may reside, draws its adjunct to it. It is common knowledge that when the bond is assigned it carries, in equity, the mortgage security with it, and the consequence is that the mortgage is often in one hand, and the equitable right to it in another. When, therefore, the bond does not accompany the mortgage the presumption of payment does not arise, but the reverse; the separation of the papers denotes something very different from payment. The bond not being accounted for, the legal intendment, in the absence of explanation, must be that the debt remains, and, of consequence, if the mortgage be fairly in

the possession of the mortgagor, it must be so by virtue of some special and unusual arrangement. I think in this case the defendants were clearly chargeable with notice to this effect, viz. that the money secured by this instrument was not paid, and that if the mortgagor had any right to the mortgage it was in consequence of some special agreement. What that agreement was, I think, it was their duty to ascertain. They took it, as they themselves say, to have it canceled at the county office ; and yet they had no right to do this unless the mortgage had been "redeemed, paid, or discharged," for such, they were aware, was the requirement of the statute. The clerk is authorized to make the cancellation whenever the instrument is produced "canceled or a receipt thereon ;" but this is the artificial standard of evidence by which the officer is to regulate his conduct. As respects other persons, they are bound to be fully satisfied by some reasonable proof, before they can properly cause the registry to be vacated, that the encumbrance has been "redeemed, paid, or discharged." What, in the present case, then, was there to induce such well founded belief? There was no pretense of redemption ; and I have already said that the non-production of the bond, which was referred to in the mortgage, was presumptive evidence that the debt remained. A perusal of the testimony in this case should, as it seems to me, satisfy all persons that it is highly impolitic to permit, in affairs of this important character, the party to draw hasty conclusions from slight premises. The counsel who acted for the defendants in this transaction was examined as a witness. After stating that the mortgage was produced, he says he asked the attorney of the mortgagor in the presence of the latter, "whether it was all right, and if we could cancel the mortgage of record ;" and he adds, by way of explanation, "I asked the question in order to be satisfied about the fairness of the transaction, not seeing any receipt on the mortgage ; if I had, I should not have asked the question." The answer to this inquiry was, that it was all right, and it was upon this answer that the defendants acted. It is manifest, therefore, that the evidence produced

did not satisfy the gentleman who represented the defendants on the occasion in question, either as to the fact that the debt had been paid, or as to the fairness of the affair; with regard to those essential matters, he had the mere word of the mortgagor, or the opinion of his attorney, unsupported by any proof. I am utterly averse to holding that this was a reasonable ground, from which a conclusion could be drawn that the effect of this security was spent. Such was not the proper or natural effect of the facts as developed, and in a question involving the rights of an absent third party, the mere averments of the mortgagor in his own favor were entitled to no weight. It is important that the courts should exact from parties transacting this kind of business, a reasonable caution. Under our present laws these securities, if all legal guards are observed, can be discharged with a facility that is in reality dangerously lax. The least that can, with safety, be required is, that a party who receives a mortgage to have it canceled on the record, shall have some reasonable proof that it has been legally discharged. In the present case no such proof existed; the circumstances were such as naturally to put a prudent person on inquiry, and the evidence shows that they produced that effect. Had such inquiry been properly pursued the infirmity in the claim of the mortgagor could readily have been discovered, and consequently the defendants are chargeable with the knowledge which would have thus resulted.

On both the above grounds, the claim of the defendants, to be regarded as *bona fide* purchasers as against the complainant, must fail. The mortgage in controversy must in all respects stand, and, accordingly, the decree must be reversed, with costs, in the court below.

The decree was reversed by the following vote:

*For reversal*—BEASLEY, C. J., DEPUE, ELMER, KENNEDY, OGDEN, OLDEN, WALES. 7.

*For affirmance*—BEDLE, CLEMENT, VREDENBURGH, WOODHULL. 4.